IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ERICK DESHONE MCCONNELL,<br><br>Defendant. | CRIMINAL ACTION FILE<br><br>NO. 4:19-CR-24-TWT-WEJ |

## NON-FINAL REPORT AND RECOMMENDATION

This matter is before the Court on defendant Erick DeShone McConnell's Motion to Suppress Evidence [13]. On July 10, 2019, the Court conducted an evidentiary hearing [19] regarding that Motion, which has been transcribed [23]. The parties have briefed the issues raised. (See Def.'s Br. [26]; Gov't Resp. [28].) The undersigned **REPORTS** that the officers had probable cause to arrest Mr. McConnell without a warrant based on information provided to them by a confidential informant ("CI") and based on his extended surveillance of the CI and the officers. Thus, the undersigned **RECOMMENDS** that the Motion be **DENIED**.

I.   **STATEMENT OF FACTS**

Detective Tony Cedano has worked in the narcotics unit of the Calhoun Police Department for five years and is also a Federal Bureau of Investigation Task

Force Officer. (Tr. 4.) Before the events of October 5, 2017, Detective Cedano had worked with the confidential informant ("CI") in this case for about five months on approximately fifteen drug investigations. (Id. at 7-8.) According to Detective Cedano, the CI provided reliable information in past drug investigations and never intentionally gave him false information or misled him. (Id. at 8-9.)

On October 5, 2017, Detective Cedano received a call from the CI advising him that she could purchase $100 worth of methamphetamine from Mr. McConnell. (Tr. 9-10, 12.) Detective Cedano and his supervisor, Commander Colburn, then met with the CI at a RaceTrac on Highway 53. (Id. at 10-11.) The officers were in an unmarked police vehicle and were wearing plainclothes. (Id. at 11.) The CI was driving a GMC Envoy. (Id.) Commander Colburn searched the CI's vehicle for narcotics and weapons, and Detective Cedano searched her person.[1] (Id.) They gave the CI $100 of special operations drug buy money in the form of five $20 bills and provided her with an audio/video recorder. (Id. at 12.) Detective Cedano turned on and briefed the recorder. (Id. at 12, 40.) The officers only instructed the CI on how to point the recorder, but did not instruct her on how to operate it or how turn it on and off. (Id. at 42.)

---

[1] Detective Cedano did not pat down the CI's groin area. (Tr. 34.)

After the meeting, Detective Cedano and Commander Colburn followed the CI to the Food Mart on Highway 41. (Tr. 13.) The officers parked across the street and watched the CI park on the south end of the building. (Id. at 13, 34-35.) They saw the CI exit her vehicle and enter the store. (Id. at 13.) The CI exited the building a few minutes later and the officers saw an African-American man (Mr. McConnell) in an orange shirt walking extremely close to her. (Id. at 13-14.) The CI entered her vehicle and defendant entered a silver Kia sedan. (Id. at 14.) The officers noted that the silver Kia began to follow the CI's vehicle as she drove north on Highway 41. (Id. at 15 & Govt' Ex. 1.)

The CI called Detective Cedano from her vehicle, told him that the controlled purchase took place, that Mr. McConnell would not talk during the buy but sent her a text stating, "It's a teenager 1.7 and 100," and that she believed Mr. McConnell was following her. (Tr. 16.) Detective Cedano also believed that defendant was following the CI. (Id. at 16-17.) Based on his training, Detective Cedano understood the text message to mean that defendant offered (and then sold) the CI 1.7 grams of methamphetamine for $100. (Id. at 17.) However, Detective Cedano did not see a hand-to-hand transaction. (Id. at 34.)

Detective Cedano told the CI to stay on the phone and that he would give her instructions on how to drive and where to drive. (Tr. 18.) The officers instructed

3

the CI to make two quick right-hand lane changes and enter Interstate 75 southbound at the last minute in an attempt to prevent Mr. McConnell from following her. (Id.) However, defendant also made evasive moves and pursued the CI onto Interstate 75. (Id. at 18-19.) The officers followed suit and continued to give the CI driving instructions, e.g., increase speed and change lanes, in order to create distance between her vehicle and defendant's vehicle. (Id. at 19.) Those maneuvers were unsuccessful, and Mr. McConnell kept the CI's vehicle in his line of sight. (Id. at 20.) The officers instructed the CI to exit Interstate 75 at Grassdale Road, make a left, go over Interstate 75, and park at the gas pump at the Travel Center. (Id. at 20-21 & Gov't Ex. 1.) Mr. McConnell also exited the interstate, parked at a Travel Plaza across the street, and positioned his vehicle facing the CI. (Id. at 21.) The officers parked at the same Travel Center as the CI. (Id. at 22.)

The officers noted that a traffic light on Grassdale Road created a buildup of cars when it turned red. (Tr. 22.) The officers believed they could use the light as a barrier to stop Mr. McConnell from following the CI. (Id.) Once the barrier was created, the officers instructed the CI to pull out of the Travel Center, turn right, and make a quick right to get back on Interstate 75 north. (Id.) However, defendant squeezed his vehicle in between two tractor-trailers and successfully crossed the four-lane highway onto Interstate 75. (Id. at 23.) The officers also returned to

4

Interstate 75 northbound, at which point Mr. McConnell showed interest in their vehicle. (Id.) The officers instructed the CI to go to her mother's house in Gordon County and wait for them. (Id. at 28.) The officers tried to evade Mr. McConnell but were unsuccessful and exited Interstate 75 at the Highway 140 exit in Adairsville. (Id. at 24 & Gov't Ex. 1; see also id. at 37.) The officers traveled into downtown Adairsville hoping that defendant would lose interest in their vehicle; however, he continued to follow them. (Id. at 24-25.)

After exhausting their efforts to evade Mr. McConnell, the officers notified uniform patrol to perform a traffic stop and arrest defendant. (Tr. 25-26.) Detective Cedano told the uniform patrol that he did not know if defendant was armed and instructed them to use caution. (Id. at 26.) Three marked police cars arrived, turned on their blue lights, and stopped Mr. McConnell at the intersection of Highways 41 and 53. (Id. at 26-27 & Gov't Ex. 1.) The officers performed a felony takedown of defendant, meaning they drew their guns as they approached the Kia, and gave Mr. McConnell verbal commands to put his hands up. (Id. at 27-28.) According to Detective Cedano, the officers had their guns drawn because they did not know why they were being followed, they did not know if the driver was armed, and they were taking precautions. (Id. at 28.)

5

Detective Cedano removed Mr. McConnell from the Kia's driver seat and placed him in handcuffs. (Tr. 28-29.) The officers briefly searched defendant for weapons and placed him in the rear seat of a patrol car. (Id. at 29.) Mr. McConnell was placed under arrest for the sale of methamphetamine and two counts of stalking. (Id.) After placing defendant in the patrol car, Detective Cedano photographed the Kia, searched the vehicle,[2] and noticed five $20 bills on the Kia's front passenger seat. (Id. at 29-30 & Gov't Ex. 2.) Detective Cedano determined that the money in the Kia was the same as that provided to the CI based on the bills' serial numbers. (Id. at 32.) Detective Cedano also seized Mr. McConnell's cell phone from the car and later obtained a warrant to search it. (Id.)

After searching the Kia, Detective Cedano and Commander Colburn met with the CI, who turned over the audio/video recorder and 1.7 grams of a crystal-like substance that field tested positive for methamphetamine. (Tr. 32-33, 41.)[3] The drug transaction was not visible on the video and no audible words were exchanged to indicate a drug transaction. (Id. at 39-40, 43.) Detective Cedano also

---

[2] Officers did not find drugs or weapons on defendant or in the Kia. (Tr. 39.)

[3] When the officers met the CI at her mother's house, she had been out of their visual contact for about half an hour. (Tr. 38.) Detective Cedano debriefed the audio/video equipment at that time and turned it off. (Id. at 41.)

6

viewed the CI's phone and took photographs of the text messages between the CI and Mr. McConnell, i.e, the communication regarding 1.7 grams of methamphetamine for $100. (Id. at 41-42.) After obtaining a warrant to search defendant's phone, Detective Cedano found the same text messages on it. (Id. at 42.) Detective Cedano later learned that Mr. McConnell and the CI had a romantic relationship in the past before the drug purchase. (Id. at 33, 36.)

## II.    THE INDICTMENT

On April 2, 2019, the grand jury returned a one-count Indictment [1] against defendant. The Indictment alleges that, on or about October 5, 2017, in the Northern District of Georgia, defendant knowingly and intentionally possessed with the intent to distribute a controlled substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 18 U.S.C. § 2. The Indictment also contains a forfeiture provision.

## III.   ANALYSIS

Mr. McConnell argues that the officers violated the Fourth Amendment by seizing him from his car, searching him, and arresting him without probable cause. (Def.'s Br. 5.) Defendant argues that the officers did not have probable cause to arrest him because they did not witness the alleged drug transaction and had not seen or field tested any drugs at the time of his arrest. (Id. at 6.) On that basis,

7

defendant asks the Court to suppress all evidence seized from his car, including the money, his cell phone, and information derived from the search of his cell phone. (Id. at 8.)

The government bears the burden to demonstrate the legality of a warrantless arrest. Welsh v. Wisconsin, 466 U.S. 740, 749-50 (1984); United States v. Tobin, 923 F.2d 1506, 1521 & n.21 (11th Cir. 1991). A warrantless arrest is constitutionally valid only when there is probable cause to arrest. See United States v. Watson, 423 U.S. 411, 417 (1976); United States v. Costa, 691 F.2d 1358, 1361 (11th Cir. 1982) (per curiam). "Probable cause exists if, at the moment the arrest was made, the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that [the suspect] had committed or was committing an offense." Holmes v. Kucynda, 321 F.3d 1069, 1079 (11th Cir. 2003) (internal quotation marks and citation omitted).

However, "[p]robable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." Adams v. Williams, 407 U.S. 143, 149 (1972). In determining whether probable cause exists, the Court "'deal[s] with probabilities . . . [which] are the factual and practical considerations of everyday life on which reasonable and prudent men, not

legal technicians, act.'" Illinois v. Gates, 462 U.S. 213, 231 (1983) (quoting Brinegar v. United States, 338 U.S. 160, 175 (1949)). "[T]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or seized." Maryland v. Pringle, 540 U.S. 366, 371 (2003) (internal quotation marks and citations omitted). An officer's decision to arrest a suspect may be objectively reasonable even though that officer has not specifically discarded every possible non-criminal explanation for the conduct that forms the basis for the decision to make the arrest. Bailey v. Bd. of Cty. Comm'rs of Alachua Cty., Fla., 956 F.2d 1112, 1120 n.5 (11th Cir. 1992); United States v. Pantoja-Soto, 739 F.2d 1520 (11th Cir. 1984).

Here, there was probable cause to arrest Mr. McConnell based on both the CI's report that he sold her 1.7 grams of methamphetamine and the officers' witnessing defendant stalking the CI and then being stalked by defendant themselves. The evidence shows that the CI provided reliable information to the officers when she told them over the phone that she had purchased 1.7 grams of methamphetamine from defendant while inside the Food Mart on Highway 41. The CI had provided Detective Cedano with reliable information in fifteen previous drug investigations, she provided detailed information regarding the transaction

9

with Mr. McConnell, the officers saw the CI enter the place designated for the transaction and exit shortly after followed closely by defendant, and the officers witnessed defendant immediately follow the CI in his car and pursue her.

Additionally, the CI knew she was wearing audio/visual equipment that Detective Cedano had activated and which the CI did not know how to turn off. Thus, it is unlikely that the CI would lie about the drug transaction because she knew the recording would be reviewed. Because the CI's hearsay statements to the officers were reliable and the officers were able to corroborate some of the information, i.e., that defendant would meet the CI at a certain place and time, it is permissible to consider the CI's statements when making the probable cause determination. Thus, the officers had reasonably trustworthy information to believe that Mr. McConnell had sold methamphetamine to the CI and could be arrested on that basis.

Furthermore, the officers also had probable cause to arrest Mr. McConnell for two counts of stalking. Detective Cedano watched Mr. McConnell follow the CI in his vehicle and instructed her repeatedly to perform evasive driving maneuvers to elude him. Defendant even parked his car, waited for the CI to leave a Travel Center, crossed four lanes of traffic, and wedged his car between two tractor-trailers to continue pursuing her on the interstate. Moreover, Mr.

McConnell later turned his attention to Detective Cedano and Commander Colburn's vehicle and pursued the officers despite their attempts to lose him. Therefore, Detective Cedano had probable cause to instruct uniform patrol to arrest Mr. McConnell immediately for stalking based on first-hand knowledge that defendant had stalked him, Commander Colburn, and the CI.

For the reasons set forth above, the undersigned **REPORTS** that the officers had probable cause to effect a warrantless arrest of Mr. McConnell for the sale of methamphetamine and two counts of stalking. Accordingly, the undersigned **RECOMMENDS** that defendant's Motion to Suppress Evidence be **DENIED**.

## IV.   CONCLUSION

For the reasons stated above, the undersigned **RECOMMENDS** that defendant's Motion to Suppress Evidence [13] be **DENIED**.

**SO RECOMMENDED**, this 21st day of October, 2019.

_____
WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE